31 F.3d 759
 The LIBERTARIAN PARTY OF WASHINGTON; Arthur Rathjen; Dan
Blachly; Tom Isenberg, Plaintiffs-Appellants,
v.
Ralph MUNRO, Secretary of State for Washington State; Brian
Sonntag, Auditor for Pierce County, Washington;
Jane Haugh, Elections Manager, for King
County, Washington,
Defendants-Appellees.
 No. 92-36620.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 6, 1994.
Decided July 14, 1994.
 
 Richard Shepard, Tacoma, WA, for plaintiffs-appellants.
 Jeffrey T. Even, Asst. Atty. Gen., Olympia, WA, Roger J. Miener, Office of Pros. Atty., Tacoma, WA, Quentin R. Yerxa, King County Pros. Attys. Office, Seattle, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before: CANBY, and T.G. NELSON, Circuit Judges and William B. Shubb*, District Judge.
 CANBY, Circuit Judge:
 
 
 1
 The Libertarian Party of Washington appeals the district court's grant of summary judgement in its suit under 42 U.S.C. Sec. 1983 and the Declaratory Judgment Act, 28 U.S.C. Sec. 2201, challenging Washington state election procedures that effectively require minor party candidates to announce their candidacies four to five weeks earlier than major party candidates. Because the challenged procedures have a rational basis and impose only a de minimis burden on the Libertarians' constitutional rights, we affirm.
 
 BACKGROUND
 
 2
 Washington state provides two methods for obtaining a place on its primary ballot, one for candidates from major parties, and one for all other candidates. A political party that fielded at least one candidate who won at least five percent of the vote in the preceding statewide election is defined as a major party. RCW Sec. 29.01.090. Major party candidates obtain a place on the ballot by filing a declaration of candidacy between the fourth Monday in July and the following Friday. RCW Secs. 29.15.010 et seq.
 
 
 3
 Parties that had no candidates who received at least five percent of the vote in the preceding statewide election are defined as minor parties. RCW Sec. 29.01.100. To get on the ballot, minor party candidates first must be nominated at a convention held no later than approximately four weeks before the deadline for filing declarations of candidacy. RCW Sec. 29.24.020. To nominate a candidate for statewide office, the party must obtain, at the convention, petitions signed by at least 200 registered voters; for other offices, the party must obtain petitions signed by at least 25 voters registered to vote in the district for which the nominations are made. RCW Sec. 29.24.030. Certificates of nomination, containing the name of each candidate, along with the petitions containing the required signatures, must be forwarded to the Secretary of State no later than one week after the convention. RCW Sec. 29.24.040.[1] The Secretary is responsible for verifying the petition signatures and other aspects of the certificates of nomination. RCW Sec. 29.24.060. If the certificates and signatures are in order, minor party candidates may proceed to file declarations of candidacy during the same week as major party candidates. RCW Sec. 29.24.070.
 
 
 4
 After the filing deadline, major parties have a second opportunity to place candidates on the ballot. On the Friday after the last day for candidates to file declarations of candidacy, major parties are permitted to fill vacancies caused by the failure of any candidates to file for a particular office on their ticket. See RCW Sec. 29.18.150. Minor parties have no similar opportunity.[2]
 
 
 5
 The effect of this bifurcated procedure is that minor party candidates must announce their candidacies during a nominating convention approximately four weeks before major party candidates must announce (when they file declarations of candidacy), and approximately five weeks before the major parties' last opportunity to place candidates on the ballot by filling vacancies. The Libertarians contend that these differences violate their rights to free speech, freedom of association, and equal protection under the First and Fourteenth Amendments.
 
 DISCUSSION
 
 6
 We review de novo a district court's grant of summary judgment. Lightfoot v. Eu, 964 F.2d 865, 869 (9th Cir.1992). In evaluating the constitutionality of the ballot access regulations the Libertarians challenge, we must weigh the degree to which the regulations burden their exercise of constitutional rights against the state interests the regulations promote. Burdick v. Takushi, --- U.S. ----, ----, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992). If the burden is severe, the challenged procedures will pass muster only if they are narrowly tailored to achieve a compelling state interest. Id. If the burden is slight, the procedures will survive review as long as they have a rational basis. See id. at ---- - ----, 112 S.Ct. at 2063-64.
 
 I: The Early Convention Requirement
 
 7
 The Libertarians argue that Washington's election schedule, which forces them to announce their candidacies a few weeks earlier than major party candidates, makes it substantially more difficult for them to obtain a place on the primary ballot than it is for major party candidates.[3] To the extent that this allegation is true, there is no dispute that such a burden implicates the Libertarians' rights. See Anderson v. Celebrezze, 460 U.S. 780, 786-88, 103 S.Ct. 1564, 1568-69, 75 L.Ed.2d 547 (1983). The issue is the severity of the handicap.
 
 
 8
 * In determining the nature and magnitude of the burden that Washington's election procedures impose on the Libertarians, we must examine the entire scheme regulating ballot access. See Mandel v. Bradley, 432 U.S. 173, 177-78, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977) (per curium). The question is whether "reasonably diligent" minor party candidates can normally gain a place on the ballot, or if instead they only rarely will succeed. Storer v. Brown, 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974). The Libertarians have the initial burden of showing that Washington's ballot access requirements seriously restrict the availability of political opportunity. American Party of Texas v. White, 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974).
 
 
 9
 In this regard, the Libertarians are short on specifics, relying primarily on a strained analogy between Washington's ballot access procedures and the laws at issue in Anderson v. Celebrezze. Anderson involved a challenge to Ohio laws requiring independent candidates to file petitions signed by at least 5,000 voters five months before major parties chose their candidates, and nearly eight months before the general election. See 460 U.S. at 782-83, 103 S.Ct. at 1566. In overturning those requirements, the Court concluded that:
 
 
 10
 An early filing deadline may have a substantial impact on independent-minded voters. In election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time. Various candidates rise and fall in popularity; domestic and international developments bring new issues to center stage and may affect voters' assessments of national problems. Such developments will certainly affect the strategies of candidates who have already entered the race; they may also create opportunities for new candidacies. Yet Ohio's filing deadline prevents persons who wish to be independent candidates from entering the significant political arena established in the State by a Presidential election campaign--and creating new political coalitions of Ohio voters--at any time after mid to late March.
 
 
 11
 Id. at 790, 103 S.Ct. at 1570-71 (citations and footnote omitted). The Court also found that Ohio's early filing made it difficult for independent candidates to gather the required 5,000 signatures because of voter apathy and the difficulty in attracting media coverage at such an early date, because of adverse winter weather during the time signatures had to be collected, and because the real issues in the campaign remained unclear when campaigning for the primary elections had not yet begun. Id. at 792, 103 S.Ct. at 1571, citing Bradley v. Mandel, 449 F.Supp. 983, 986 (D.Md.1978).
 
 
 12
 Taking their cue from Anderson, the Libertarians contend that by being forced to declare their candidacies approximately one month before major party candidates, they lose the opportunity to respond to changes in the political landscape and thus to garner support from voters who may be dissatisfied with the major parties' positions. The problem with this argument is that, while the Libertarians claim to suffer exactly the same disabilities that the Court found unconstitutional in Anderson, their situation is vastly different.
 
 
 13
 First, minor party candidates in Washington are required to announce barely more than a month before major party candidates, not five months earlier. While it is easy to see how issues and events arising between a late winter filing deadline and a general election the following November might dramatically affect opportunities for candidacy in a national presidential race, it is far less likely that significant new opportunities might develop in state and local races during the thirty-day interval challenged by the Libertarians.
 
 
 14
 Second, the difficulty of obtaining 5,000 signatures in the dead of winter in Ohio, five months before major party nominating conventions and eight months before the general election, is readily apparent. The Libertarians' task of obtaining 25 or 200 signatures in the late spring roughly 30 days before the major party filing deadline and approximately 75 days before the election pales by comparison. Cf., McLain v. Meier, 851 F.2d 1045, 1051 (8th Cir.1988) (approving scheme requiring 7,000 signatures 55 days before primary); Dr. John Hagelin for President Committee of Kansas v. Graves, 804 F.Supp. 1377, 1383 (D.Kan.1992) (approving scheme requiring 5,000 signatures 91 days before election).
 
 
 15
 Finally, unlike Anderson himself, who was denied a place on the Ohio ballot, the Libertarians claim an injury that is entirely speculative. All three candidate plaintiffs already intended to run at the time they brought this suit; their ability to run did not depend on late-arising issues that created an opportunity for candidacy after the convention deadline. And all three announced and filed on time; they evidently had no difficulty in obtaining petition signatures. In fact, the Libertarians cite no instance in which any candidate ever has been denied access to the Washington ballot, or otherwise has been disadvantaged, because of the procedures they assail.
 
 
 16
 Similarly, there is no evidence that major party candidates are advantaged by the system. In Washington's 1992 elections, for example, over 250 candidates already had announced by April 8, nearly two months before minor parties were required to hold their conventions; the Libertarians do not point to a single major party candidate who waited to announce until after the minor party convention deadline. This historical experience strongly suggests that Washington's ballot access regulations do not severely burden the constitutional rights of minor parties or their candidates. See Storer, 415 U.S. at 742, 94 S.Ct. at 1285 (past experience may be indicative of degree of burden); see also Munro v. Socialist Workers Party, 479 U.S. 189, 199, 107 S.Ct. 533, 539, 93 L.Ed.2d 499 (1986) (finding that Washington's system "virtually guarantees" minor party candidates access to the ballot).[4] In related circumstances, the Supreme Court has determined that an even longer time interval imposes only a "very limited" burden. See Burdick, --- U.S. at ----, 112 S.Ct. at 2065 (approving Hawaii's prohibition against write-in voting, which effectively allowed no new candidates to enter a race less than 60 days before the election); see also Ashworth v. Fortson, 424 F.Supp. 1178, 1180 (N.D.Ga.1976) (minor party nomination deadline 90 days in advance of major party primaries not significantly burdensome). But see Whig Party v. Siegelman, 500 F.Supp. 1195, 1204 (N.D.Ala.1980) (concluding that minor party filing deadline 60 days in advance of last day major parties could name substitute candidates was severely burdensome).
 
 
 17
 The Libertarians simply parrot the language of Anderson, without demonstrating how it actually applies to Washington's scheme. There is no reason to believe that a reasonably diligent minor party candidate will have any difficulty obtaining a place on Washington's primary ballot.
 
 B
 
 18
 Because there is at most a de minimis burden on the Libertarians' constitutional rights, Washington need demonstrate only that its election schedule is rationally related to a legitimate state interest. See Duke v. Cleland, 5 F.3d 1399, 1405 (11th Cir.1993); Zielasko v. Ohio, 873 F.2d 957, 961 (6th Cir.1989); Unity Party v. Wallace, 707 F.2d 59, 62 (2d Cir.1983). We may look to any conceivable interest promoted by the challenged procedures, whether or not the state cited that interest in its briefs or in the district court. The Libertarians bear the burden of demonstrating that the regulations they attack have no legitimate rational basis. Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 462-63, 108 S.Ct. 2481, 2489-90, 101 L.Ed.2d 399 (1988).
 
 
 19
 Washington may require the Libertarians, as a prerequisite to obtaining a place on the ballot, to demonstrate support for their candidates by holding a convention and gathering signatures. See Anderson, 460 U.S. at 788 n. 9, 103 S.Ct. at 1570 n. 9. It follows that the state has a legitimate interest in requiring that the convention be held far enough before the filing deadline for the signatures to be verified. See Anderson, 460 U.S. at 800, 103 S.Ct. at 1576; Storer, 415 U.S. at 743, 94 S.Ct. at 1285.
 
 
 20
 The current election scheme is rationally related to this interest. After receiving certificates of nomination, the Secretary of State must verify that the signatures on the attached petitions are those of voters registered in the appropriate districts and that they have not signed petitions for different candidates for the same office. RCW Secs. 29.24.030, 29.24.040, 29.24.060. To do so, the Secretary generally must refer the petition to the county auditor for the appropriate legislative district. After verifying the signatures, the auditor must return the petitions to the Secretary, who in turn notifies the officer who presided at the party's convention of the Secretary's decision concerning the petitions' sufficiency. RCW Sec. 29.24.060. Disposing of challenges to these decisions takes additional time. See id. If a minor party waits until the last possible moment to file its certificates of nomination, the state may have as few as ten working days to accomplish these tasks under the current scheme. In light of the facts that as many as twelve minor parties have filed in one Washington election, Munro, 479 U.S. at 196, 107 S.Ct. at 538, and that (according to the Libertarians) each potentially may submit as many as 1,225 signatures for verification, the schedule as determined by the challenged regulations is not irrational.
 
 
 21
 The Libertarians contend that the state could streamline its system and verify signatures in a shorter period of time. No doubt this is true. But, because the current scheme poses only a minuscule burden for minor party candidacies, the Constitution does not require Washington to adopt a system that is the most efficient possible; it need only adopt a system that is rationally related to achieving its goals. See McLain v. Meier, 851 F.2d 1045, 1050 (8th Cir.1988) ("A litigant could always point to a day slightly later that would not significantly alter a state's interests until the point at which primary elections could not be held at all."). The scheduled time interval between filing certificates of nomination and the deadline for filing declarations of candidacy meets this test.
 
 
 22
 As an alternative, the Libertarians argue that the current schedule bears no rational relationship to any state interest because, even if the state needs the approximately 14 days now allotted to verify signatures, there is no reason to require all candidates to file by the end of the currently scheduled filing week. That is, they suggest that minor parties could hold their conventions and file certificates of nomination anytime up to the last day major parties may announce candidacies (when they fill vacancies on the ticket). The state could then take up to 14 days to verify their signatures and certify their candidacies, and it would still have roughly three weeks to spare before the primary.
 
 
 23
 This alternative would enable minor party candidates to file later than nearly all major party candidates. Washington, however, has at least two legitimate reasons to maintain the current filing deadline for all candidates. First, the present schedule accommodates Washington's administrative needs. To enable complete distribution, including distribution to absentees and overseas service personnel, in time for the elections, ballots must be printed and available no later than 20 days before the primary, approximately four weeks after the filing deadline. Wash.Code Ann. Sec. 29.30.075. Before the ballots are printed, the state must have sufficient time, after signatures are verified, to determine the order in which candidates will appear on ballots, to transmit this information to the printer, and to receive the finished ballots in time to check them for accuracy and have them reprinted if necessary. While it undoubtedly is true that by dint of increased effort or efficiency the state could shave a few days or perhaps even a week off of the time it takes to prepare ballots, there is no evidence that the present schedule is so wholly unrelated to the state's legitimate administrative purposes as to be irrational. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) ("Although parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, they cannot prevail so long as it is evident ... that the question is at least debatable." (citations, quotations and footnote omitted)).
 
 
 24
 Second, the current filing deadline promotes Washington's interest in having an informed electorate. See Anderson, 460 U.S. at 796, 103 S.Ct. at 1573. While this interest will not justify a filing deadline seven months in advance of an election, id., the 45 day interval imposed by Washington's current election calendar is not unreasonable as a means of permitting voters to learn who the candidates are. See, e.g., Burdick v. Takushi, 937 F.2d 415, 420 (9th Cir.1991), aff'd, --- U.S. ----, ---- - ----, 112 S.Ct. 2059, 2064-67, 119 L.Ed.2d 245 (1992) (filing deadline 60 days before primary election promotes legitimate state interest in voter education).
 
 
 25
 Washington's requirement that signatures be on hand approximately 45 days before ballots must be ready and approximately 65 days before the primary therefore promotes legitimate state interests. See Cromer v. South Carolina, 917 F.2d 819, 825 (4th Cir.1990) (noting that most states have fixed a filing deadline of 75-90 days before primaries or elections, and that such a deadline is justifiable in view of needs for administrative processing and voter education). Inasmuch as third party and independent candidacies are virtually unimpaired by these requirements, we conclude that Washington's ballot access schedule does not run afoul of the First or Fourteenth Amendments.
 
 II: The vacancy filling provisions
 
 26
 RCW Sec. 29.18.150 provides that if "a place on the ticket of a major political party [is] vacant because no person has filed for nomination as the candidate of that major political party," the party can select and certify a candidate for that position no later than a date that is approximately one week after the end of the regular filing period. Minor parties are afforded no similar opportunity.
 
 
 27
 The Libertarians are not entirely clear as to how they believe this provision violates their constitutional rights. To the extent that the vacancy-filling provision allows major party candidates to announce a week later than otherwise would be the case, we already have determined that the burden posed by the difference in filing deadlines for major and minor parties is extremely small. It is immaterial whether the difference is four weeks (calculated from the end of the regular filing period) or five (calculated from the last date to fill vacancies). The state's legitimate interests in having sufficient time to verify signatures, print ballots, and educate voters justify the current schedule.
 
 
 28
 Nor are the Libertarians injured merely by the fact that they are treated differently from major parties. See Board of Election Commissioners v. Libertarian Party, 591 F.2d 22, 25 (7th Cir.), cert. denied, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979). States need not provide identical routes to the ballot for major and minor party candidates. American Party of Texas v. White, 415 U.S. 767, 782 n. 13, 94 S.Ct. 1296, 1306 n. 13, 39 L.Ed.2d 744 (1974). Unless a difference in treatment makes it substantially easier for major party candidates to get on the ballot than for minor party candidates to do so, there is no equal protection violation. See id. at 781-83, 94 S.Ct. at 1306-07.
 
 
 29
 In this case, the difference in treatment stems from Washington's compelling interest in ensuring that candidates for office have substantial public support before they may be listed on the ballot. See Munro, 479 U.S. at 194, 107 S.Ct. at 536. Major party candidates in Washington seem to have exceptionally easy access to the ballot because all they need do is either file during the normal filing period or take advantage of the challenged vacancy-filling provision. But they may take this route only because they represent parties that already have achieved the relatively difficult task of demonstrating a significant amount of support by winning at least 5% of the vote in the preceding election.
 
 
 30
 Minor parties, which failed to obtain that level of support in the preceding election, must demonstrate support in another way. Washington has determined that each minor party candidate must do so by gathering the signatures of 25 voters if running for local office, or 200 signatures if running for statewide office. The Libertarians present no evidence, nor can we discern any, that these requirements are significantly more burdensome than the 5% requirement imposed on major parties.
 
 
 31
 The Libertarians evidently do not dispute this analysis. They contend, however, that whenever they have held a convention and collected the required number of signatures for a candidate running for one office in any given election district, they have demonstrated significant support, and that because they have done so, the state has no additional interest in prohibiting them from filling ticket vacancies for other offices in that district pursuant to section 29.18.150.
 
 
 32
 The Libertarians misconceive the purpose of Washington's convention and petition requirements. Apparently, they believe that these requirements are designed to show that the party has the required support to be permitted to place any of its candidates on the ballot. It is true that the ballot access regulations in some states work in precisely this fashion.[5] But this scheme is not the only acceptable form of ballot access regulation. States instead may require that individual candidates, rather than parties, demonstrate substantial support as a prerequisite to getting on the ballot. See Munro, 479 U.S. 189, 107 S.Ct. 533 (approving requirement that individual candidates win at least 1% of the vote in a primary as a prerequisite to getting on the general election ballot); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (approving requirement that individual candidates present petitions signed by 5% of registered voters as prerequisite to ballot access). The Washington statutes that apply to minor parties are of this latter sort. They require a showing of support for each individual minor party candidate by requiring that all candidates be nominated at the conventions in which signatures are gathered; those signing the petitions must know who the party's candidates are. See RCW Sec. 29.24.020.
 
 
 33
 That major party candidates qualify for the ballot because their party demonstrated substantial support in the preceding election, whereas minor party candidates must individually show that they have the required support is not a constitutionally impermissible difference. Washington has determined that there is substantial support for any candidate of a party that won at least 5% of the vote in the preceding election. However, it also has determined that the ability of any single minor party candidate to gather 25 signatures in a particular district (or 200 signatures statewide) does not indicate substantial support for other candidates from that party who want to run in the same jurisdiction. The Libertarians give us no reason to doubt the rationality of these determinations. See Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 463, 108 S.Ct. 2481, 2490, 101 L.Ed.2d 399 (1988).
 
 
 34
 We conclude Washington has a compelling interest in not permitting minor parties to fill ticket vacancies in the same manner as major parties, and that its ballot access regulations promote this interest in an evenhanded, nondiscriminatory manner.
 
 CONCLUSION
 
 35
 Because Washington's ballot access regulations promote legitimate state interests while posing at most only a de minimis burden on minor party and independent candidates, we affirm the decision of the district court granting summary judgment for the state of Washington.
 
 
 36
 AFFIRMED.
 
 
 
 *
 The Honorable William B. Shubb, United States District Judge for the Eastern District of California, sitting by designation
 
 
 [1]
 If nominations are made only for districts entirely within a single county, the certificates and petitions are to be filed directly with the county auditor. RCW Sec. 29.24.040(7). For simplicity's sake, throughout the opinion we ignore this exception as it does not affect our analysis or conclusions
 
 
 [2]
 Thus, in 1992, this was the election schedule:
 Last day to hold convention ........................................ July 4
Last day to file petitions and certificates of nomination ......... July 13
Last day for Secretary to give permission to file ................. July 24
First day to file declarations of candidacy ....................... July 27
Last day to file declarations of candidacy ........................ July 31
Last day to withdraw ............................................. August 6
Date on which major parties may fill vacancies ................... August 7
Absentee ballots must be printed ................................ August 26
Primary ...................................................... September 15
 
 
 [3]
 In their reply brief, the Libertarians momentarily appear to change their tune and to claim that ballot access is not their primary concern:
 Plaintiff's primary concerns here relate to strategic advantages available to major parties, which advantages discriminate invidiously against minor parties, after minor parties [have held] certified nominating conventions according to current law.
 The Libertarians, however, are utterly silent as to what these strategic advantages might be, and fail to elaborate on this single sentence. It is, in fact, difficult to conceive of any such advantages that might arise as a result of the short four to five week interval between the time minor party candidates must announce and the last possible moment for major party candidates to announce. Given that the record is devoid of evidence that major party candidates routinely--or ever--delay their announcements until after the minor party conventions, we conclude that the minor parties suffer no strategic disadvantage from the challenged procedures.
 
 
 [4]
 While the scheme in place at the time Munro was decided required minor party candidates to announce only one week before major party candidates, we do not believe that increasing this time differential to the four to five weeks at issue here dictates a different conclusion
 
 
 [5]
 For instance, Florida requires minor parties to present petitions signed by at least 3% of the state's registered voters before the party's candidates may appear on the ballot. Fla.Stat.Ann. Sec. 99.096(1). After the signatures are verified, the party may name whatever candidates it wishes for various offices. Fla.Stat.Ann. Sec. 99.096(5); see Libertarian Party v. Florida, 710 F.2d 790 (11th Cir.1983) (approving this scheme), cert. denied, 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984)